**KINLOCH TELEPHONE CO. et al. v. LOCAL UNION NO. 2 OF INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS et al.**

(District Court, E. D. Missouri, E. D. May 6, 1920.)

No. 5297.

1. Injunction ☞101(1)—Since Clayton Act, strike in violation of employé's contracts will not be enjoined, though causing employer irreparable injury.

Since passage of Clayton Act Oct. 15, 1914, § 20 (Comp. St. § 1243d), declaring that no restraining order or injunction shall prohibit any person or persons from terminating any relation of employment, or from ceasing to perform any work or labor, or recommending, advising, or persuading others by peaceable means to so do, the officials of a labor union, who called the strike against an interstate telephone company, will not

be enjoined from maintaining and supporting the strike by payment of benefits and by other peaceful means, even though the strike was in direct violation of contract between the employer and strikers, and such strike caused the employer irreparable injury; the Clayton Act having curtailed the power of federal courts of equity to grant injunction.

2. **Torts** ⊜⟹10—**Strikers can use only lawful means of persuasion, notwithstanding the Clayton Act.**

Notwithstanding Clayton Act Oct. 15, 1914, § 20 (Comp. St. § 1243d), provides that no restraining order or injunction shall prohibit persons from terminating relation of employment, or from recommending or advising others by peaceable means to do so, etc., the officials of a union who called and maintained a strike on feigned grounds for purpose of forcing employer to maintain a closed shop, had no right to have the shop picketed in such manner as to cause persons to assemble thereabout, so as to produce intimidation by the very fact of numbers, the test what can be done is what any ordinary citizen would be permitted to do if no labor dispute existed, and the word "peaceful" in the act must be strictly construed, and any unwarranted interference with the business of the employer or of employés who do not strike is unauthorized.

3. **Constitutional law** ⊜⟹48—**All reasonable inferences, in favor of statute.**

A statute attacked as unconstitutional must be held valid until all reasonable inferences of its goodness are resolved against it.

4. **Constitutional law** ⊜⟹55—**Clayton Act, forbidding injunctions against employés, not invalid as interference with power of judiciary.**

Clayton Act Oct. 15, 1914, § 20 (Comp. St. § 1243d), forbidding injunctions and restraining orders prohibiting any person or persons from terminating any relation of employment, or advising or recommending in a peaceable manner any other person to terminate such relation, will not by a federal District Court be held unconstitutional, as impinging upon the power of the judiciary.

In Equity. Bill by the Kinloch Telephone Company and the Kinloch Long-Distance Telephone Company against Local Union No. 2 of the International Brotherhood of Electrical Workers and others. On motion of plaintiffs for temporary injunction. Motion denied.

W. R. Orthwein, of St. Louis, Mo., and Bruce A. Campbell, of East St. Louis, Ill., for plaintiffs.

John P. Leahy, of St. Louis, Mo., for defendants.

FARIS, District Judge. Plaintiffs herein brought this bill of complaint against Local No. 2 of the International Brotherhood of Electrical Workers, O. J. McSpadden, individually and as secretary of the conference board of the International Brotherhood of Electrical Workers, Orville E. Jennings, individually and as international representative of the International Brotherhood of Electrical Workers, Al H. Givens, individually and as business agent of said local No. 2, Harry Thompson, individually and as vice president of said Local No. 2, Dan Nohl, individually and as financial secretary of said Local No. 2, Harry McGuire, Ed Arnold, William Lantz, Al H. Givens, and others named in the caption, individually and as members of the executive board of said Local No. 2, and the members, associates, confederates, and attorneys of the above-named persons and organizations, as defendants, to perpetually enjoin and restrain said defendants from compelling, advising, persuading, or inducing, by threats,

intimidation, force, or persuasion, any of the employés of the plaintiffs, to leave the latter's service, or to fail or refuse to perform their duty as such employés, and from inducing, by the means aforesaid, any persons desiring to seek employment from plaintiffs from so accepting such employment, and from inducing, by the means aforesaid, former employés of plaintiffs, who are on a strike, from continuing to strike, in violation of a contract of such employés with plaintiffs, and from inducing, by the means aforesaid, any of the employés of plaintiffs now on a strike from violating or continuing to violate said contract of such employés with plaintiffs, and from trespassing on the premises of plaintiffs, and from communicating in any manner whatever with plaintiffs' employés, for the purpose of inducing such employés to break their said contract with plaintiffs, and for other reasons of which the above named are fair types, and which will either more nearly and clearly appear from the views expressed herein, or which are not deemed pertinent to an understanding of either the facts or the law involved in the case.

Upon an order to show cause, issued herein, all the defendants, except O. E. Jennings, appeared, and much evidence was offered, both by plaintiffs and defendants, upon the issues whether plaintiffs are entitled, upon the facts shown at the hearing and the law applicable thereto, to the relief prayed for.

Upon this hearing, the contract between the plaintiffs and the then employés of the plaintiffs, bearing date July 3, 1919, was offered in evidence. Substantially this contract provided that plaintiffs' business, which is concededly of an interstate character, should for the term of one year thereafter be run and operated on what is commonly called an "open shop" basis. This contract further provided that plaintiffs should not interfere with the union affiliations of their employés, and that, in the event of any dispute, such dispute should be referred to a committee of employés, and other persons on plaintiffs' part, as a board of arbitration, whose decision should be binding upon both of the contracting parties.

Upon the hearing evidence was offered pro and con upon the question whether this contract had been breached by plaintiffs, or by the employés of plaintiffs. In passing, it may be stated that none of the defendants herein are employés of plaintiffs. Many of plaintiffs' employés, however, and all of those who are on a strike, are members of defendant Local Union No. 2 of the International Brotherhood of Electrical Workers, of which organization the defendants here are, as appears from the petition and in the caption thereof, either international officers or officers and members of various labor unions, including Local Union No. 2. I do not deem it necessary to refer in extenso to the great mass of evidence adduced upon both sides upon the hearing of this case; but I deem it sufficient to merely state certain findings of fact and conclusions of law which I am of opinion were either proven, or which arose, upon the hearing, or which follow from a construction of the contract in evidence.

I think I may fairly find that there was no sufficient proof of prohibited or unlawful picketing, or of intimidation, or of the use of

abuse or physical force, to compel the granting of demands or to further the strike, within the purview of the Clayton Act (38 Stat. 730). Such evidence of physical force, duress, or intimidation as was offered is either lacking in connecting defendants and union members therewith or is disproved by the weight of the evidence adduced. It is fairly clear from the evidence that the strike was called in a studied and concerted effort on the part of the defendants to unionize the business of plaintiffs; that is, to compel plaintiffs to convert their business from an "open shop" into a "closed shop."

I am of opinion that the most that the proof may be said to show is that the defendants, as members, officers, and agents of the International Brotherhood of Electrical Workers and as individuals, are causing, maintaining, and supporting the strike in question upon wholly feigned and insufficient grievances, with the aim and intent, as already stated, to compel plaintiffs to unionize their business; that the result of such action upon the part of defendants has been to cause the contract existing between plaintiffs and its employés to be breached by such employés without sufficient reason or excuse, in law or in fact, and, further, that defendants threaten to cause other of plaintiffs' employés to breach their contract with the plaintiffs, and that defendants are seeking to attain the results above stated by advice, persuasion, and inducements bottomed upon labor unionization and union obligations.

Construing the contract offered in evidence, I am of opinion that this contract requires arbitration as therein provided for, even though one party to the same may contend that there is no grievance in fact upon which to bottom the complaints made. I think that the committee referred to therein was intended to be a committee on the part of the employés, composed of employés of plaintiffs, and not a committee of the Local Union, to which said union employés of plaintiffs might belong, or a committee composed of members of the conference board of local unions. Neither upon a construction of this contract, nor in common fairness or reason, is there any obligation on the part of plaintiffs to pay the union dues of plaintiffs' employés, or to see that such dues are paid, or to discharge men who do not pay such dues, although it is clear from the evidence that this is one of the chief ostensible reasons for calling the strike now existing.

The proof abundantly shows that at a meeting of one of the local unions of the International Brotherhood of Electrical Workers, at which an international officer of said brotherhood presided, it was voted to authorize defendant Al H. Givens, as business agent of such local union, to call a strike whenever he desired to do so. Thereafter such a strike was called by Givens, and practically all of the linemen of plaintiffs, who belonged to the local union, struck and quit work. This they did upon the advice and persuasion of defendants, either acting singly or in concert. Pending such strike, and prior to the issuance of the temporary restraining order herein, defendants furnished so-called strike benefits to the striking employés. For the most part, the employés of plaintiffs who struck did so because they were members of the local union, and because of the strike order

adopted by such union, perforce their membership in and obligations to such union. Some persuasion, advice, and inducements to strike, bottomed upon union obligations, appear in the record; likewise, as forecast, there was personal persuasion by defendants in numerous instances.

[1] In the light of the provisions of the Clayton Act, have the defendants, by the several acts found, become in equity liable to be enjoined? I am constrained, by the view I am compelled to take of the fairly plain provisions of the act, supra, to hold that they have not. The Clayton Act was passed on the 15th day of October, 1914, and provides generally, in substance, that no injunction shall be granted in any case between employers and employés, unless such injunction is necessary to prevent irreparable injury to property or property rights, for which injury the law furnishes no adequate remedy. To this general inhibition there are then added the below specific inhibitions against the issuance of an injunction, to wit:

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States." 38 Stat. 738, § 20 (Comp. St. § 1243).

Upon the record there is no manner of doubt that irreparable injury has been done to the property of the plaintiffs, and that further irreparable injury is threatened, and that the law applicable to the facts in this case provides no adequate remedy. But the definite particularization set out in that part of the Clayton Act, which I have quoted supra, specifically defines what acts shall nevertheless be deemed lawful (of course, so far only, as concerns the power to enjoin such acts—Kroger Grocery Co. v. Retail Clerks, etc. [D. C.] 250 Fed. 890), even though the doing of such acts shall result in irreparable injury, without an adequate remedy at law for the redress of such injury. That this law worked a radical change in some aspects of the law theretofore existing, in forging restrictions upon the power of courts of equity to issue injunctions, I cannot bring myself to doubt. Kroger Grocery Co. v. Retail Clerks, supra.

Looking at this law even casually, it seems plain that any employé, by virtue of the provisions which I have quoted, may singly (that is, by himself or herself) or in concert with others (that is, by virtue of prearranged agreement) terminate any relation of employment. Any relation of employment would seem to connote and include any contract of employment; that is, an employment at will, or an employ--

ment for a definite contractual term, whether such term has or has not expired by lapse of time.

Said act further provides that any person or persons, acting alone or together, may by peaceful means advise or persuade others—that is, any employé—to terminate such employment. In order to advise and persuade employés to terminate their employment, and in order to communicate or obtain, or for the purpose of communicating information, or obtaining information as to the existing situation, any person or persons may go to or attend at any place to which he or she might have gone, if no labor dispute existed: Provided, he or she go in the same way in which he or she would have gone if no such dispute existed. And all such persons may, of course, peacefully assemble, pending such dispute, in the same manner in which any other citizens might assemble if no such dispute existed. Other provisions of this act are, I think, either so plain and clear as to call for neither interpretation nor exposition, or the same are not now involved in this case.

[2] These provisions, of course, do not confer any right to assemble about or to picket the shop or place of business of any former employer under such circumstances, or in such numbers as to menace peace or produce intimidation by reason of the very fact of numbers. Neither does it permit any striker, or any person acting in concert with any striker, to use physical force or intimidation of any sort, or abuse, or duress, or any threat of physical force, either to the employer, or to the employés who are working, or to persons who are seeking employment of the employer, or to persons who have business, or who desire to transact business, with the employer. So much, I think, is clear from the provisions of the act itself, because, plainly the test therein of what may be done is what any ordinary citizen would have been permitted to do if no labor dispute existed. Stephens v. Telephone Co. (D. C.) 240 Fed. 759; Duplex Co. v. Deering (D. C.) 247 Fed. 192.

"Peacefully," as used in this act, means peacefully in the strict sense of that word; for it will be noted that the words "peacefully" and "lawfully" run as red threads through the very warp and woof of this act. Surely no persons can be said to act peacefully, when they crowd the streets, sidewalks, or alleys near to or adjacent to the shop or place of business under their displeasure and, though silent, threaten and intimidate by numbers. Neither can a person be within the peace or the protection of this statute when he or she, singly or with others, in furtherance of a strike, uses threats, abuse, profane or obscene language, physical force, or other intimidation to any employer, or to his agents, servants, or employés, present or potential, or to the customers, or agents and employés of customers, present or potential.

In the case of Stephens v. Ohio State Telephone Co., 240 Fed. loc. cit. 771, Judge Killits collates in a most graphic and admirable way many of the things (there are probably others) which striking employés and the members of labor unions, acting in concert with such strikers, may not lawfully do in furtherance of a strike, and yet

continue to be peaceful within the purview of the Clayton Act. I quote:

"Would it be lawful for one or more men to use offensive, abusive, insulting, or threatening language to another or others—for one to call another a 'rat,' a 'scab,' a 'thief,' an 'outcast,' or by any other name commonly accepted as offensive, or degrading, or calculated to provoke the other to break the peace in resentment? Would it be lawful for one man, or more, to take station adjacent to the place of rest, lodging, or work of another, or others, and there, by gesture, language, or otherwise, convey to the other insult or threat? Would it be lawful for one or more men to force his or their talk upon the unwilling ear of another—to compel him to listen against his will? Would it be lawful for one man or more to persistently follow another to and from his work, to his home or lodging, and about the city, forcing upon him unwillingly their presence, without occasion other than to unmistakably suggest to him their hostility unless he meets their views? Would it be lawful for one to photograph another against his will, especially under circumstances which indicate unfriendliness to be the spirit, and a hostile use of the photograph to be the object? Would it be lawful to slink upon an unsuspecting man, inoffensively gazing into a shop window, and deal him a blow—to step from the hiding of an alley to trip a lady, and then to strike her escort as he stoops to her assistance? * * * Would it be lawful to intercept a young girl on her way to work, and beat and scratch her and tear her clothing; to destroy the telephone connections with public hospitals, so as to leave them without means of communication; to destroy fire department lines, hazarding the safety of property; to so menace, threaten, and frighten the employés of another as to make it necessary to convey them to and from their work in armored or protected cars; to so act as to gather large crowds of bystanders and curiosity seekers about places of business, to the interruption thereof; for a crowd of a dozen or more men to surround a vehicle, follow it through the business streets of a city, shouting offensive names, stopping or interfering with traffic; to cut automobile tires; to strew tacks in streets for the purpose of destroying tires; to throw bricks and stones at automobiles; to assault and beat a boy engaged in delivering water to a place of business; to assault persons entering one of the prominent hotels of the city, or to follow such persons from their place of employment to said hotel, calling them offensive names and causing crowds to gather? * * *

"'Any fair-minded man' will answer each of these questions above stated in the negative. It must be borne in mind that not every act is lawful against which no positive provision of law exists. Many acts are unlawful, for which no affirmative penalty is enacted, or against which no redress at law is possible; and some, while within the prohibitions of positive law, may not offer a practicable occasion for redress at law, yet a court of equity may be asked to protect the intended sufferer from the annoyance and damage they may create, and such a court may enforce its prohibitions. No legislation yet exists to the contrary, if legislation depriving courts of such power is possible. Some acts, lawful when once performed, may become unlawful when repeated for the purpose of annoyance or damage, and may be restrained when that purpose becomes plain. The right of free speech does not give any one the privilege to force his views upon others, to compel others to listen. The right of the others to listen or to decline to listen is as sacred as that of free speech. It is clear that, if one does not desire speech of another, he may surely have his privacy therefrom as the privacy of his home. It is undeniable that the so-called right of peaceful persuasion may be lawfully exercised only upon those who are willing to listen to the persuasive arguments.

"Again, every man has the right to the pursuit of his lawful business or employment undisturbed, and any act performed with intent to disturb the full and unrestrained exercise of his faculties and wishes in such employment is plainly unlawful. Again, he has the right of privacy and freedom from molestation of private persons, hostile or otherwise, at his home, at his lodging, at his place of work; he has the right to walk the streets without annoyance from the unwelcome attentions of others, so long as he is conducting himself in a lawful manner. Again, the right of one to the privacy of his

own features, to the end that he may not be photographed without his consent, is manifest. It has been sustained by the courts in actions for damages. Again, the right of one man to work is as much entitled to respect as the right of another to cease work or to strike. Again, the right of an employer to engage whomsoever he chooses is as strong as the right of an employé to refuse to work. Again, the right of an employer to have access to and from his place of business, and his right to have the streets and public highways in front of his place of business kept clear of crowds, bystanders, and curiosity seekers, is as strong as the right to picket, and no picketing which is conducted in a manner to attract and retain the presence of crowds can be said to be peaceful or within the law.

"It is a safe and proper generalization that any action having in it the element of intimidation or coercion, or abuse, physical or verbal, or of invasion of rights of privacy, when not performed under sanctions of law by those lawfully empowered to enforce the law, is unlawful; every act, of speech, of gesture, or of conduct, which 'any fair-minded man' may reasonably judge to be intended to convey insult, threat, or annoyance to another, or to work assault or abuse upon him, is unlawful. Not a syllable of the Clayton Act, or of any other law, whether of legislation of Congress or of the common law, sanctions any of the incidents we have referred to. They are to be condemned as legally inexcusable—such must be the verdict of 'any fair-minded man'—nothing can be said in justification.

"These propositions are so elemental that, but for the confusion which exists in many minds that a labor controversy affects the commonest rules of life, it would seem a waste of time to state them. The existence of a strike does not make that lawful which would otherwise be unlawful. These personal rights to which we have alluded are, in each instance, precisely those which the striker himself would insist upon were conditions reversed. They are also so plain, and the answers to the questions involving them so certain, that one called upon to enforce the law, if he has but ordinary intelligence, will plainly fail to do his duty when in his presence a fellow citizen suffers an invasion of his rights of this character."

[3, 4] By a supplemental bill, filed since this case was submitted to the court, it is urged in substance that, if it shall be held that the provisions of the Clayton Act by their terms restrict theretofore existing powers of courts of equity to issue injunctions in labor disputes between employers and employés, then so much of said act which so restricts the courts in the behalf mentioned is unconstitutional. The force of this contention is instantly apparent. Much of the argument presented in favor of the unconstitutionality urged is directed against the lawfulness of a secondary boycott. This point is not involved in the instant case. Judge Manton, then District Judge, and now Judge of the Circuit Court of Appeals for the Second Circuit, held that this act is constitutional. Duplex Co. v. Deering (D. C.) 247 Fed. loc. cit. 196. The Duplex Case went by appeal to the Circuit Court of Appeals, and was there affirmed. Duplex Co. v. Deering, 252 Fed. 722, 164 C. C. A. 562. While no reference is made in the carrying opinion (there was a dissenting opinion by Judge Rogers) to the question of the unconstitutionality of the act, I take it that, if the point was urged, it was deemed of no sufficient moment to render necessary a discussion of it. Since the rule is that the statute attacked as unconstitutional must be held valid till all reasonable inferences of its goodness are resolved against it (State v. Baskowitz, 250 Mo. 82, 156 S. W. 945, Ann. Cas. 1915A, 477; State v. Thompson, 144 Mo. 314, 46 S. W. 191), I feel constrained to follow the Duplex Case, supra, till some court superior to this shall rule the matter.

Counsel for plaintiffs, to sustain their right to injunctive relief herein, rely largely upon the case of Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461. While the Hitchman Case was not decided until three years after the Clayton Act took effect, it was, however, begun seven years before the passage of that act. If the provisions of the Clayton Act passed under judgment in the Hitchman Case, then plaintiffs have, upon the facts proven, clearly shown themselves entitled to the injunction for which they pray. But I cannot bring myself to conclude that the Supreme Court of the United States held the Clayton Act in judgment when it ruled the Hitchman Case. Judge Trieber seemingly held to the view that the Hitchman Case did not consider the Clayton Act. Kroger Grocery Co. v. Retail Clerks, supra. In his view I am constrained to acquiesce.

Many cases are urged upon my attention, which hold substantially to the view, so forcefully expressed in Atchison v. Gee (D. C.) 139 Fed. 582, that there can be no such thing as peaceful picketing, any more than there can be "chaste vulgarity, or peaceful mobbing, or lawful lynching"; but of all such cases it is only necessary to say that none of them held in judgment the provisions of the Clayton Act. See 24 Cyc. 838; Erdman v. Mitchell, 207 Pa. 79, 56 Atl. 327, 63 L. R. A. 534, 99 Am. St. Rep. 783; Franklin Union No. 4 v. People, 220 Ill. 355, 77 N. E. 176, 4 L. R. A. (N. S.) 1001, 110 Am. St. Rep. 248.

Being constrained to follow the fairly plain provisions of the Clayton Act, I am of opinion that this case is ruled by it, and, however strongly I may heretofore have entertained the view that, when there is committed an irreparable injury to property and when similar injury is clearly threatened and no adequate remedy at law exists, equity may grant relief by injunction, even as against employés, I am yet bound by this statute, which I deem it my plain duty to follow, even to the exclusion of these views.

It follows that the motion of plaintiffs for a temporary injunction should be denied, and the temporary restraining order heretofore issued dissolved. Let an order be entered accordingly.